NOT FOR PUBLICATION                                    [Dkt. Ent. 1]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| DOROTHY L. MOORE-DUNCAN, Regional Director of the Fourth Region of the NATIONAL LABOR RELATIONS BOARD, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | : : : : : : : : : | |
| Plaintiff, | : : | Civil No. 11-00041 (RMB/JS) |
| v. | : : | **OPINION** |
| SOUTH JERSEY SANITATION CORPORATION, | : : : | |
| Defendant. | : : | |

APPEARANCES:

Margaret M. McGovern, Esq.
William E. Slack, Jr., Esq.
National Labor Relations Board
615 Chestnut Street, 7th Floor
Philadelphia, PA 19106
    Counsel for Petitioner

Russell L. Lichtenstein, Esq.
Jeffrey Ryan Lindsay, Esq.
Cooper, Levenson, April, Niedelman & Wagenheim, PA
1125 Atlantic Avenue, 3rd Floor
Atlantic City, NJ 08401-4891

1

Counsel for Respondent

**BUMB,** UNITED STATES DISTRICT JUDGE:

This matter comes before the Court on an application for interim injunctive relief pursuant to § 10(j) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(j), pending final disposition of a related matter before the National Labor Relations Board (the "Board" or "Petitioner"). Specifically, the Board seeks an order directing the respondent South Jersey Sanitation Corporation ("Respondent" or the "Company") to (1) offer immediate reinstatement to its former employee, Jeraldo Cotto, who was wrongfully discharged, and (2) cease and desist from coercive conduct interfering with the union organizing activities of the Teamsters Union Local No. 115 (the "Union"). (See Pet.'s Br. 2, Dkt. Ent. 1-1.)

On April 5, 2011, the Court conducted a hearing on this matter and thereafter required supplemental briefing. For the reasons that follow, the Court grants Petitioner's request.

## I. BACKGROUND

The facts set forth below are derived from the record of the underlying administrative proceeding in South Jersey Sanitation Corporation v. Teamsters Union Local No. 115, No. 4-CA-37537 (the "Administrative Proceeding"). [See Dkt. Ents. 6, 8.]

Respondent is a trash and recycling collection firm with operations in Hammonton, New Jersey.  It employs approximately 30 truck drivers and 60 helpers or "throwers."

## A. Union Organizing Activity

In late 2009, Jeff Kissling, one of Respondent's drivers, circulated a petition among the drivers asking for improved wages and benefits, including health benefits.  Kissling testified that all of the drivers signed the petition, and on January 1, 2010, the Company's owner, Anthony Colasurdo, told Kissling that he had hurt his feelings by circulating the petition and that Colasurdo had no option but to discharge him.  (Transcript of Admin. Proceeding ("Admin. Tr.") 34-35, Dkt. Ent. 8.)

From June 2007 through June 16, 2010, Respondent employed Jeraldo Cotto as a truck driver.  (Admin. Tr. 42:14-15.)  Cotto testified that Colasurdo questioned him in late January 2010, about Kissling's petition.  According to Cotto, Colasurdo told him that the person who had circulated the petition was "no longer with us," that Colasurdo would "burn the company down" before he would let anyone "extort" him, and that if employees did not like the way he ran the Company, they could either go or "be fired."  (Admin. Tr. 45.)

In May 2010, the employees, led by Cotto, began a union organizing drive at the Company.  Cotto distributed and collected union authorization cards from the other employees before and after work.  In all, he collected cards from approximately 38 of

3

the 90 employees, which exceeded the 30% necessary to support a petition for election pursuant to the Board's administrative rules.  (Admin. Tr. 82:2-3; Pet.'s Suppl. Br. 3.)

Cotto testified that on May 28, 2010, Colasurdo interrogated him about his union activity.  Cotto testified that he lied to Colasurdo, claiming he knew nothing about the union, because he was afraid if he told the truth, he would be fired, just as Kissling had been.  (Admin. Tr. 52-56.)  According to Cotto, Colasurdo then told him to keep him informed about any union activity, particularly if anyone approached him about union cards.  (Admin. Tr. 54-56.)

Cotto further testified that despite Colasurdo's warning, he continued his organizing activity.  On June 7, 2010, based on Cotto's submission of signed authorization cards, the Union filed a petition for a representation election with the Board's regional office in Philadelphia.  On June 12, 2010, Cotto helped organize a union meeting with the Company's employees.  Prior to that meeting, Edwin Morales, a supervisor at the Company, told Cotto he was being pinpointed as the leader of the Union effort and that if the Union came in, it would "mess it up for everybody" and a lot of people "would be out of work."  (Admin. Tr. 61-62.)  According to Cotto, he observed Morales sitting in a parked car both before and after the June 12th meeting.

In early June, Company personnel called several group meetings of employees to discuss the Union campaign and

discourage employees from supporting the Union.  According to Cotto and another driver, Jose Cartagena, who still works for Respondent, Colasurdo asked for time to institute benefits and threatened to sell the business if they unionized.  (Admin. Tr. 57-59; 198-99.)

On June 16, 2010, Cotto told Respondent that he had received a subpoena to testify the following day at a Board hearing on the representation petition.  That afternoon, Colasurdo discharged Cotto, purportedly because Cotto was not insurable as a driver. Cotto's insurability, however, had been an issue of concern for several years.  (Admin. Tr. 64-65.)

**B. The Underlying Action**

On October 27, 2010, Petitioner filed a complaint with the Board, alleging that Respondent had engaged in unfair labor practices under Sections 8(a)(1), (3), and (4) of the Act, 29 U.S.C. § 158(a)(1, 3, 4), by discharging a union supporter and making various threats and statements.  The case was tried by Administrative Law Judge Robert Giannasi (the "ALJ") on January 24-25, 2011.  The ALJ found merit to most of the allegations in the Complaint.  Petitioner subsequently dropped the allegations found to be without merit from the instant petition.  [Dkt. Ent. 14-1, at 2.]  Respondent has appealed the decision to the Board.

Specifically, the ALJ "found that Respondent [had] engaged in certain unfair labor practices," and ordered it to cease and desist from such conduct.  (ALJ Opinion ("Op.") 14:17-18, 14:36-

5

15:21, Dkt. Ent. 14.)  The ALJ also found that Respondent had
unlawfully discharged Cotto and ordered Respondent "to offer him
full and immediate reinstatement to his former job, or, if that
job no longer exists, to a substantially equivalent position . .
. ."  (Op. 14:19-21.)

Petitioner now seeks injunctive relief pending the Board's
review of the ALJ decision.  [Dkt. Ent. 14.]  Respondent concedes
the first prong of the two-part analysis for injunctive relief
pursuant to § 10(j), that there exists "reasonable cause" to
believe that unfair labor practices have been committed.
Respondent, however, contests the second prong, arguing that the
requested relief, specifically Cotto's reinstatement, is not
"just and proper."  (Resp.'s Ltr Br. 2, Dkt. Ent. 18.)

## C. The Petition for § 10(j) Injunctive Relief

Upon Petitioner's request, the Court reviewed the record in
the underlying administrative proceeding.  Since the ALJ had not
addressed the "just and proper" prong and the parties had not
adequately briefed this issue, the Court conducted a hearing on
it.  At this hearing, it became clear that the Union had done
virtually nothing to attempt to unionize the Company after
Cotto's discharge.[3]  The Court questioned the obvious: whether

---

[3] Michael Darden, chief organizer for the Union at South Jersey
Sanitation, initially testified that he did not continue his attempts to
unionize the Company, because Cotto informed him "everybody was scared."  (Tr.
23:22-24.)  (Although Respondent objected to Darden's testimony, presumably on
hearsay grounds, it appears the Court did not rule on this objection.

union activity had halted because (1) employees were afraid to unionize due to Cotto's wrongful discharge, or (2) the Union deliberately decided to discontinue the campaign without Cotto. (Tr. 36:18-37:3.)   The Court directed the parties to file supplemental briefing on whether reinstatement of an unlawfully discharged employee is just and proper where the union has undertaken virtually no effort to continue its organizing activity after the discharge.   The parties submitted briefing on the matter, and it is now ripe for adjudication.

## II. LEGAL STANDARD

Section 10(j) of the Act authorizes this Court to grant the interim reinstatement of an unlawfully discharged employee pending the Board's resolution of the underlying NLRB proceeding

---

Respondent was correct that pursuant to the hearsay rule, this statement may not be admitted to prove the truth of the matter, i.e., that the employees were in fact scared.  See Fed. R. Evid. 801(c).  However, it may be admitted for the limited purpose of showing the effect of the statement on the listener, Darden, in order to explain why he did not continue his unionizing efforts.  See, e.g., Marks v. Marina Dist. Dev. Co., 213 Fed. Appx. 147, 153-54 (3d Cir. 2007) (affirming district court's admission of police officer's testimony about dispatch call where it was admitted not for the truth of the matter but to show its effect on the officer.)  Nevertheless, Darden later testified as follows:

> [Counsel for Respondent]: You haven't spoken with any other employees
>     who signed cards from South Jersey Sanitation Corporation,
>     correct?
> [Darden]: Correct.
> [Respondent's Counsel]: You and the Teamsters have done nothing to
>     continue your efforts to organize that workforce, correct?
> [Darden]: Correct.
> ...
> [Respondent's Counsel]: [I]n terms of communicating with any members of
>     the workforce at South Jersey Sanitation Corporation, you've done
>     - the Teamsters have done nothing, correct?
> [Darden:] Correct.

(Tr. 32:19-33:7.)

7

where: (1) there is "reasonable cause" to believe that unfair labor practices have been committed, and (2) the injunctive relief sought is "just and proper."  See Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1078 (3d Cir. 1984).  Respondent has conceded the "reasonable cause" prong.  Thus, the Court considers only whether the requested relief is "just and proper".

Injunctive relief is "just and proper" under § 10(j) "when the nature of the alleged unfair labor practices are likely to jeopardize the integrity of the bargaining process and thereby make it impossible or not feasible to restore or preserve the status quo pending litigation."  Pascarell v. Vibra Screw, Inc., 904 F.2d 874, 878 (3d Cir. 1990).[4]  The "critical determination," then, "is whether, absent an injunction, the Board's ability to facilitate peaceful management-labor negotiation will be impaired."  Id. at 879.  The district court must determine "whether the failure to grant injunctive relief would be likely to prevent the Board, acting with reasonable expedition, from effectively exercising its ultimate remedial powers."  Id. (citing Suburban Lines, 731 F.2d at 1091-92).  This requires the Court to focus not "on what relief may ultimately be granted to individual employees, but on the likelihood of harm to the

---

[4] "[T]he relevant status quo is not the situation as it was before the Board filed its petition, but the situation as it was right before the alleged unfair labor practices took place."  Vibra Screw, 904 F.2d at 878, n.5.  Thus, in this case, the relevant status quo was the situation after Cotto had secured authorization cards but before his discharge.

8

bargaining process in the interim." <u>Vibra Screw</u>, 904 F.2d at 879, n.7 (quoting <u>Wellington Hall</u>, 651 F.2d at 907) (internal quotations omitted).[5]  Thus, interim reinstatement of an unlawfully discharged employee is warranted under § 10(j) where "the chilling effect of management retaliation may outlast the curative effects of any remedial action the Board might take," including ultimate reinstatement of the illegally discharged worker.  <u>Id.</u> at 878-79.

Significantly, in <u>Suburban Lines</u>, the Third Circuit interpreted its prior opinion in <u>Wellington Hall</u> as creating a "presumption" that ultimate reinstatement is unlikely to adequately vindicate the remedial powers of the Board.[6]  731 F.2d at 1094.  Several district courts in this Circuit recognized this

---

[5]  Importantly, "the relief to be granted is only that reasonably necessary to preserve the ultimate remedial power of the Board and is not to be a substitute for the exercise of that power." <u>Kobell</u>, 731 F.2d at 1091. Section 10(j) relief is not designed to vindicate the rights of private employees but to protect the public interest in the integrity of the collective bargaining process.  <u>See</u> <u>Eisenberg v. Wellington Hall Nursing Home, Inc.</u>, 651 F.2d 902, 906-07 (3d Cir. 1981).

[6]  The <u>Suburban Lines</u> Court also acknowledged that an argument could be made that "§ 10(j) was reserved for the <u>extraordinary</u> case and that it was not intended to undermine the normal processes of labor law adjudication." 731 F.2d at 1091, n.26.  The Court concluded, however, that it need not "consider fully" this principle and instead recognized a "presumption" in favor of injunctive relief.  <u>Id.</u> at 1094; <u>see also</u> <u>Eisenberg v. Tubari</u>, Civ. Action No. 85-1857, 1985 WL 32832, *3 (D.N.J. July 8, 1985) (finding that although the Third Circuit recognized an "argument" that § 10(j) was reserved for the extraordinary case, it was not so held).  <u>But see</u> <u>Traction Wholesale Center Co.</u>, Civ. Action No. 97-6544, 1997 WL 792909, *1 (noting in a 3-page opinion that "it is still clear that § 10(j) is reserved for the extraordinary case," without mentioning the <u>Suburban Lines</u> Court's disclaimer that it need not "consider fully" this principle).  Indeed, the Sixth Circuit has questioned the <u>Suburban Lines</u> Court's suggestion that "10(j)'s use is reserved for the extraordinary cases," given "Congress' use of the less than stringent 'just and proper' standard." <u>Fleischut v. Nixon Detroit Diesel, Inc.</u>, 859 F.2d 26, 30 n.4 (6th Cir. 1988).

"presumption." See, e.g., Pascarell v. Gitano Group, Inc., 730 F. Supp. 616, 624 (D.N.J. 1990); Pascarell v. Orit Corp./Sea Jet Trucking, 705 F. Supp. 200, 204 (D.N.J. 1988), aff'd, 866 F.2d 1412 (3d Cir. 1988); Kobell v. Menard Fiberglass Products, Inc., 678 F. Supp. 1155, 1168 (W.D. Pa. 1988); Tubari, 1985 WL 32832, *20.

However, the Third Circuit later qualified this principle, questioning whether Wellington Hall had actually established such a "presumption" or merely "refined the factors that the district court must consider[.]" Vibra Screw, 904 F.2d at 879 n.7 (internal citations omitted). In Vibra Screw, the Third Circuit interpreted the prior case law as establishing "deference" toward the Board:

> The 'presumptive' quality to this inquiry stems from the deference due the Board when it requests a § 10(j) injunction. Unless there are circumstances, like the size, intimacy, and longevity of the bargaining unit, which indicate that the bargaining process will not be harmed, courts must be deferential to the Board's determination that the integrity of the process needs interim protection.

Id. Other courts have given deference to the Board, noting that it "exercises its Section 10(j) discretion sparingly" and takes an "overall cautious approach" to pursuing such relief. See, e.g., Gold v. State Plaza, Inc., 435 F. Supp. 2d 110, 120 (D.D.C. 2006) (noting that in 2005, the Board "sought injunctive relief in only 15 cases out of the 1,440 complaints issued by NLRB

10

Regional Directors"). In other words, the Board's decision to seek injunctive relief pursuant to § 10(j) represents a good-faith indication by the Board that it entertains the alleged violations in this particular case with a "heightened level of concern." Id. Thus, the Court begins its analysis with a deferential view of the Board's assessment that interim relief is warranted.

Against this backdrop, the Court is also mindful that reinstatement is only appropriate where the unlawful discharge resulted in a chilling effect on Respondent's employees. Vibra Screw, 904 F.2d at 879, n.6 ("[T]he chilling effect finding is a preliminary determination that must be made in order to determine whether the bargaining unit would not be able to reconstruct itself easily[.]"); Lightner v. Dauman Pallet, Inc., 823 F. Supp. 249, 253 (D.N.J. 1992), aff'd, 993 F.2d 877 (3d Cir. 1993) ("Reinstatement is appropriate if the court finds that the termination of respondent's employees resulted in a 'chilling effect' on co-employees.").

### III. DISCUSSION

At the outset, the Court recognizes that evidence of a chilling effect is, by its very nature, difficult to establish, since an employee who is truly fearful of management retaliation will not want to broadcast such information for fear of

11

management retaliation.   Nevertheless, a petitioner must do more than merely rely on a deferential standard to support a request for 10(j) relief.

Here, Petitioner offers no evidence that the Union attempted to organize after Cotto's discharge, aside from contacting Cotto. The Board broadly rests upon the discharge itself to establish a chilling effect on Respondent's employees.  Importantly, however, the Board also cites to certain additional facts for support, including: (1) the nature of the unfair labor practices, i.e., the timing of Cotto's discharge "on the heels of the subpoena request" and the resulting stalled union campaign, (Pet.'s Suppl. Br. at 7, Dkt. Ent. 22; Tr. 50:14-51:6); (2) Cotto's statement in the underlying proceeding that no union cards were signed after his discharge, because certain employees were "up on the fence" since his termination and "d[id]n't want to end up losing their jobs," (Admin. Tr. 85:5-11, Dkt. Ent. 8); and (3) the fact that five employees failed to appear despite being subpoenaed in the underlying administrative proceeding, (Tr. 51:2-6; Admin. Tr. 265:7-22).

Assessing the third fact first, Petitioner asks the Court to speculate as to why certain employees failed to appear at the administrative proceeding.  While it is plausible that they were afraid of being associated with the Union in light of Cotto's

12

termination, it is also quite plausible that they did not appear for any number of other reasons.[7]  In fact, the Court notes that two employees did appear under subpoena, Miguel Capeles and Jose Cartagena.  Capeles testified that he originally supported the Union, but changed his mind after speaking with his family and girlfriend <u>before</u> Cotto was discharged.  (Admin. Tr. 131:7-20.) Cartagena testified that he supported the Union before Cotto was terminated and continues to support it.  (Admin. Tr. 207:7-12.) Thus, the first fact does not support an inference that management retaliation caused a chilling effect.

    The Court next considers the second fact, that Cotto's testimony supports evidence of a chilling effect.  In the administrative proceeding, Cotto testified that no other union cards had been signed since his termination, "[b]ecause the guys are up on the fence since I've gotten terminated.  They don't want to end up losing their jobs."  (Admin. Tr. 85:5-11.)  At the "just and proper" hearing, Cotto testified that employees had told him they were afraid of supporting the union.  (Tr. 14:2-14.)  These statements were admissible under the "state of mind" exception to the hearsay rule for the limited purpose of showing

---

[7] For example, Cotto testified that some of the employees were "illegals," so their absence may also have been due to fears associated with immigration status.  (Admin. Tr. 62:6.)  The Court recognizes that it engages here in <u>gross</u> speculation merely to prove a point.

13

that the fear existed (but not what caused it).[8]  Such "fear is highly relevant to the propriety of injunctive relief." Lightner, 823 F. Supp. at 252 n.2.  "[A]n inference may be drawn from this state of mind that, if corroborated by additional evidence, may properly support injunctive relief."  Hirsch, 949 F. Supp. at 303-04.

The Court finds such additional evidence in the first fact raised by Petitioner.  A chilling effect can be inferred from the particularly egregious circumstances of Cotto's termination. First, there is "overwhelming" evidence that the Company fired Cotto because of his union activity.[9]  The timing of the discharge is particularly compelling since it occurred in the midst of Cotto's union activities and immediately after Colasurdo received a copy of Cotto's subpoena.  (Op. 11:21-23.)  Thus, it is quite likely that Respondent's employees would interpret the discharge as retaliation against union activity.  Since Cotto was

---

[8]  See Fed. R. Evid. 803(3); Hirsch v. Corban Corps., 949 F. Supp. 296, 303 (E.D. Pa. 1996) (NLRB could offer union representative's testimony under state of mind exception that, when asked to join union, employees expressed fear of losing jobs; same statements could not be offered to prove what caused fear and additional evidence would be required); Lightner, 823 F. Supp. at 252 n.2 (same).

[9]  The ALJ found in relevant part:
        On this record, the Acting General Counsel has easily met his burden
        of proving that Respondent fired Cotto, because he was a leader in the
        Union's campaign and because he was subpoenaed to testify in a Board
        proceeding in support of the Union's election petition. . . . In sum,
        the evidence in support of the Acting General Counsel's initial
        showing of unlawful motivation is overwhelming."
(Op. 11:1-3 (emphasis added).)

the only visible supporter of the union,[10] his discharge just as the union drive was getting underway, sent a very clear message that efforts to unionize would be punished with lay-offs.   In fact, this message was compounded by the prior termination of Kissling.  Although the Board never alleged his termination as an unfair labor practice, the record reflects that his termination was connected to his union activity as well.[11]

The Third Circuit has recognized the adverse impact of such firings on employees.  In Vibra Screw, the few employees who had been most open in their support of the union were terminated. 904 F.2d at 881.  The Third Circuit interpreted this as a clear message from management that "if one is associated with the union, one will be disciplined."  The Court explained:

> Not only is that precisely the kind of message, and action, that the NLRA prohibits, it is the kind of message that cannot be effectively retracted even if the discharged employees are ultimate reinstated by the Board.  Employees will not risk the uncertainty and hardship attendant upon even temporary lay-off if that is the price they must pay for union activity.

---

[10] (See Pet.'s Suppl. Br. 2, Dkt. Ent. 22; Tr. 22:12-14, 23:3 (Darden testimony that Cotto was the Union's "inside" guy and that he did not have contact with individual employees other than Cotto)).

[11] The ALJ's Opinion states in relevant part:
    There is, of course, no doubt that circulating a petition among employees seeking improved benefits is protected concerted activity and it is clear that Kissling was engaged in such conduct.  There is also no doubt that Colasurdo's remarks to Cotto in their January meeting made clear that Kissling was terminated for engaging in such protected activity."
(Op. at 7:28-32 (emphasis added).)

15

Id. (emphasis added).  Indeed, the "discharge of active and open
union supporters risks a serious adverse impact on employee
interest in unionization."  Wellington Hall, 651 F.2d at 907
(internal quotations and citations omitted).

     Furthermore, the Court notes that the public interest in
safeguarding the collective bargaining process in its formative
stages is at stake here.  Cotto's discharge occurred during the
embryonic period of the union campaign, just before the Board
hearing on the representation petition.  Courts have recognized
that "[t]he absence of key union organizers can contribute to the
erosion of support for a nascent union movement."  Pye v. Excel
Case Ready, 238 F.3d 69, 75 (1st Cir. 2001) (internal citation
omitted) (affirming grant of § 10(j) relief where employees were
discharged during early stages of union campaign); cf. Vibra
Screw, 904 F.2d at 881 (affirming reinstatement of discharged
employee prior to certification of the union); Eisenberg v.
Lenape Products, Inc., 781 F.2d 999, 1006 n.1 (3d Cir. 1986)
(Becker, J., dissenting) (noting that "it may be more important"
to protect the early stages of a union campaign where "efforts to
unionize were nipped in the bud by the employees' discharge")
(citing Maram v. Universidad Intraamericana De Puerto Rico, Inc.,
722 F.2d 953 (1st Cir. 1983)).  Unlike bargaining units that are
well-established and can easily reconstruct themselves after a

16

union supporter is illegally discharged, the union campaign here was in its early stages and thus particularly susceptible to Respondent's unlawful labor practices. Given the long passage of time before the Board decides the merits of this case, the "spark to unionize" may be completely extinguished before the Board can exercise its remedial powers. Pye, 238 F.3d at 75.

Furthermore, the record indicates that Cotto was the only visible union organizer at the Company. See, supra, Part I. Thus, his immediate reinstatement is particularly important to the public interest because "the absence of the only union organizer at the company for an extended period of time could irreparably harm the union's chances of organizing the employees." See Schaub v. W. Michigan Plumbing & Heating, Inc., 250 F.3d 962, 971 (6th Cir. 2001) (quoting district court opinion and affirming reinstatement of wrongfully discharged employee). If Cotto's reinstatement occurs only after the Board reaches a final resolution of this case, union activity will likely remain at a standstill, the prospects of unionizing the Company will be substantially diminished, and the Board's ultimate remedial powers will be frustrated.

Respondent argues that there is no credible evidence of a chilling effect, citing to Cotto's testimony that the employees' interest in the union has not been affected by his discharge.

17

(Tr. 11:19-23.)  Petitioner responds that "it is not inconsistent for employees to be in favor of the Union and yet be unwilling to come forward as open union supporters."  (Pet.'s Suppl. Reply Br. 3).  The Court agrees.  The fact that employees still <u>want</u> to unionize does not mean that they <u>will</u>.  This is precisely how a chilling effect operates: employees who want to unionize feel they cannot do so without subjecting themselves to management retaliation.

Respondent relies on an unpublished district court opinion in this Circuit, <u>Moore-Duncan v. Traction Wholesale Center Co.</u>, Civ. No. 97-6544, 1997 WL 792909 (E.D. Pa. 1997), for authority to deny the petition for lack of union activity.  In <u>Traction Wholesale</u>, the Court denied reinstatement of a discharged employee where the Board provided no "concrete evidence, direct or circumstantial" that the relief was necessary.  <u>Id.</u> at *3. The Court finds this case distinguishable, however, because the employer's conduct there was "not egregious" and the employer had no knowledge of the union organizing activities prior to the day of the discharge.  <u>Id.</u> at *2.  The <u>Traction</u> Court also recognized twice that the "just and proper" analysis in that case was "not an easy determination to make."  <u>Id.</u> at *2.  Furthermore, that Court applied a higher standard (limiting § 10(j) relief to the "extraordinary" case), than the more deferential standard

prescribed by <u>Vibra Screw</u>.  <u>Compare</u> <u>id.</u> at *1 (citing <u>Suburban Lines</u>, 731 F.2d at 1091 n.26) <u>with</u> discussion <u>supra</u> Part II and n.6.

Finally, Respondent argues that the Court should consider the undue delay with which the Board sought injunctive relief, given that six to seven months passed between Cotto's discharge in mid-June and the filing of this petition in early January.  It is true that an "insufficiently explained delay provides some probative evidence that interim injunctive relief [is] not entirely essential."  <u>Suburban Lines</u>, 731 F.2d at 1094, n.33. However, when reviewing the amount of time the Board takes to file a § 10(j) petition, "there is a certain amount of leniency that the Board must be afforded, stemming from the deference to the Board that is built into the statutory scheme."  <u>Vibra Screw</u>, 904 F.2d at 881.  The Board must have time to complete a "thorough investigation before it even requests the injunction." <u>Id.</u>  In <u>Vibra Screw</u>, the Third Circuit noted that where the Board's delay was at most "just under six months," the district court erred in finding this an unacceptably "leisurely pace" that precluded injunctive relief.  <u>Id.</u>; <u>see also</u> <u>Moore-Duncan v. Aldworth Co.</u>, 124 F. Supp. 2d 268, 293 (D.N.J. 2000) (granting § 10(j) relief after an eight-month delay between the discriminatory layoffs and the filing of a petition).

Accordingly, the Board's delay in this case is not fatal to its petition.

In light of the deference the Court must give to the Board, and after careful consideration of all the relevant factors and the specific facts of this case, the Court balances the equities in favor of Petitioner. The Court emphasizes, however, that the Board may not rely <u>solely</u> upon an unlawful discharge to meet its burden under § 10(j). It must do more, and in this case it has: given the circumstances of Cotto's discharge, his visible role as the lead union organizer, the critical timing of his discharge at the early stage of the union campaign, and the statements made by several employees expressing a fear of being laid off for supporting the union, the Board has met its obligation under the "just and proper" prong. The adverse impact of Cotto's discharge on employee interest in unionization must be countered swiftly and decisively to protect the public interest in the integrity of the collective bargaining process. Thus, in the final analysis, the Court finds that Cotto's reinstatement is necessary to restore the status quo pending resolution of the underlying litigation and to preserve the Board's ultimate remedial powers to facilitate peaceful management-labor negotiation.

## B. Remaining Injunctive Relief

In light of the deferential standard discussed above, as

well as the ample evidence of Defendant's unfair labor practices,
and the fact that Defendant has conceded the "reasonable cause"
prong, the Court also finds the remaining injunctive relief "just
and proper."  In order to prevent the Company's unfair labor
practices from having a lingering effect, Respondent must cease
and desist from any coercive conduct that interferes with the
organizing activities undertaken by the Union, insofar as the
Union continues such organizing activities at the Company.

## IV. CONCLUSION

For all of the reasons stated herein, the Board's petition
for injunctive relief pursuant to § 10(j) of the Act shall be
**GRANTED.**  An appropriate Order will issue herewith.


Dated: <u>May 23, 2011</u>                    <u>s/Renée Marie Bumb</u>
                                        RENÉE MARIE BUMB
                                        UNITED STATES DISTRICT JUDGE